FILED
2014-Nov-05  AM 11:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BOZORGMEHR POUYEH,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ]          **CV-12-BE-4198-S** |
| | ] |
| **UNIVERSITY OF** | ] |
| **ALABAMA/DEPARTMENT OF** | ] |
| **OPHTHAMOLOGY,** | ] |
| | ] |
| **Defendant.** | |

**MEMORANDUM OPINION**

This matter —asserting employment discrimination, "education discrimination," and Constitutional violations brought pursuant to § 1983—is before the court on "Motion for Reconsideration of Final Order to Dismiss with Preducie [sic] of the Fourth Amendment [sic] Complaint" (doc. 97); "Motion for Leave to Supplemet [sic] the 'Motion for Reconsideration of Final Order of Dismissal'" (doc. 106); and "Motion for Hearing for the 'Motion for Reconsideration Final Order of Dismissal'" (doc. 107).  For the reasons stated below, the court FINDS that the Motion for Leave to Supplement and the Motion for Hearing are due to be DENIED, and the Motion for Reconsideration is due to be GRANTED, and the court will AMEND its prior Memorandum Opinion as further discussed below.  However, for the reasons stated below, the court FINDS that a reconsideration of this matter renders the same result; this case is due to be DISMISSED in its entirety, and the court will CONFIRM its Final Order to that effect.

The Plaintiff, Dr. Bozorgmehr Pouyeh, brings the Motion for Reconsideration under

Rules 59 and 60 of the Federal Rules of Civil Procedure.  A motion to alter or amend under Rule

59 does not provide a mechanism for a dissatisfied party to re-litigate a matter.  *Arthur v. King*,

500 F.3d 1335, 1343 (11th Cir. 2007) ("A Rule 59(e) motion cannot be used to relitigate old

matters, raise argument or present evidence that could have been raised prior to the entry of

judgment").  The Eleventh Circuit has recognized two grounds for granting a Rule 59 motion:

"[1] newly-discovered evidence or [2] manifest errors of law or fact."  *Id.* at 1343 (quoting *In re

Kellogg,* 197 F.3d 116, 119 (11th Cir. 1999)).  Courts in this Circuit have recognized that an

intervening change in controlling law is also a ground for reconsideration and an exception to the

law of the case doctrine. *See, e.g.,  Summit Med. Ctr. of Ala., Inc. v. Riley,* 284 F. Supp. 2d 1350,

1355 (M.D. Ala. 2003) (addressing a Rule 59 motion); *Oliver v. Orange Cnty., Fla.,* 456 F.

App'x 815, 818 (11th Cir. 2012) (listing the following exceptions to the law of the case doctrine,

allowing a district judge to reconsider a prior ruling:  "(1) new evidence; (2) an intervening

change in the law that dictates a different result; or (3) that the prior decision was clearly

erroneous and would result in manifest injustice.").

In his motion for reconsideration, Dr. Pouyeh also invokes relief under Rule 60.  Rule 60

provides additional grounds for relief from a court order, such as "mistake, inadvertence,

surprise, or excusable neglect" (60(b)(1)); "fraud ..., misrepresentation, or misconduct by an

opposing party" (60(b)(3)); "the judgment is void" (60(b) (4)); "the judgment has been satisfied,

released or discharged ... (60(b)(5)); or "any other reason that justifies relief" (60(b)(6)).  Fed. R.

Civ. P 60(b).  Because Dr. Pouyeh presents his request for reconsideration under both rules

without distinguishing which ground for reconsideration falls within which rule, the court will

simply address the specific grounds he enunciates for reconsideration and his corresponding

motion to supplement the record.

### *Intervening Change in Law*

One ground for reconsideration is when a party presents to the court an intervening change in law that dictates a different result.  In his motion for reconsideration and motion for leave to supplement the record with additional case law, Dr. Pouyeh did not present an intervening change in the law; all the cases he cited were decided well before the original briefing.  For that reason, the court FINDS, in its discretion, that the motion for leave to *supplement* is due to be DENIED.  However, to determine whether the motion for *reconsideration* is due to be granted, the court will address the other grounds for reconsideration.

### *New Evidence/Mistake based on Evidence Not Part of the Original Record*

A second ground for reconsidering a prior decision is the presentation of new evidence that was not available to the court at the time of the original decision.  Dr. Pouyeh did present new evidence in his motion for reconsideration regarding the exhaustion of administrative remedies under the Title VII claim.  In its previous Memorandum Opinion addressing the motion to dismiss, the court had found "an apparent absence of the condition precedent to the filing of a Title VII claim: the exhaustion of administrative remedies."  The court had noted that Dr. Pouyeh challenged UAB's denial on **October 29, 2011** of an interview for a residency program and attached an EEOC charge dated **April 30, 2012**, more than 180 days after the challenged action. The court stated that "[a]ssuming [the charge] was filed on or subsequent to the date [Dr. Pouyeh] signed it, the EEOC charge was not filed within 180 days of the alleged violation, which would have expired on April 26, 2012.  Thus, the EEOC charge was untimely and did not meet the condition precedent for the [2011] alleged violation ...." (Doc. 95, at 6).

3

The court recognizes that Defendant did not raise the exhaustion of administrative remedies issue, and, because the court raised it *sua sponte,* this motion for reconsideration is Dr. Pouyeh's first opportunity to address the issue.  He addresses it in part by attaching the EEOC Charge Detail Inquiry.  This document was not attached to any of the four complaints and was not otherwise incorporated by reference into them, and the court is addressing a motion for reconsideration of a motion to *dismiss*, not a motion for summary judgment.  However, the court will consider this document at this juncture without converting the motion into a motion to dismiss; "'[b]ecause exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, [the issue of exhaustion] should be raised in a motion to dismiss [and] it is proper for a judge to consider facts outside of the pleadings'" to resolve this particular issue and develop the record.  *Tillery v. United States Dep't of Homeland Sec.,* 402 F. App'x 421, 424 (11th Cir. Oct. 22, 2010) (Title VII case quoting *Bryant v. Rich,* 530 F.3d 1368, 1377 (11th Cir. 2008) (PLRA case addressing exhaustion issue; the Eleventh Circuit found it applicable to Tillery's Title VII exhaustion of judicial remedies issue).

The EEOC Charge Detail Inquiry document reflects that the EEOC had received charge information by mail from Dr. Pouyeh on March 29, 2012, well within the 180-day period; that, on April 20, 2012,  the EEOC mailed back to him a charge for his signature and for return within 30 days; and that, on April 25, 2012, the charge was drafted and mailed to Dr. Pouyeh for a second time for dating and signing. (Doc. 97, at 23, Ex. 1).  Because the Charge Detail Inquiry document was not attached as an exhibit to his complaint with the EEOC Charge, the record in this case did not reflect this information until Dr. Pouyeh provided it with his current motion. Dr. Pouyeh explains in the current motion that he was living in Miami at the time he decided to

4

file a discrimination charge with the Birmingham District Office of the EEOC, and so, the charging process occurred by mail, and he reiterates the dates and times of mailing reflected on the Charge Detail Inquiry.

Because of this new information that was not previously a part of the record in this case, the court acknowledges that the EEOC *received* Dr. Pouyeh's charging information within the 180 day period.  Although Dr. Pouyeh did not sign the EEOC charge within the 180 day period, this additional information reflects that the EEOC received his charge information before that deadline.  EEOC regulations interpret the relevant Title VII provisions to mean that a charge is "filed" when the Commission receives it. *See* 29 C.F.R. § 1601.13(a); *see also Taylor v. Gen. Tel. Co.,* 759 F.2d 437, 442 (5th Cir. 1985) (holding that for the purposes of Title VII, Taylor's charge was filed when the EEOC received it ); *Clark v. Coats & Clark, Inc.,* 865 F.2d 1237, 1240-41 (11th Cir. 1989) (holding, in an ADEA case, that the EEOC's timely receipt of the former employee's informal intake questionnaire constitutes the timely filing of an EEOC charge even though the employee signed the formal charge after the 180 day period).

Accordingly, the court WILL GRANT the motion for reconsideration to correct its ruling[1] as to the issue regarding exhaustion of administrative remedies for Title VII involving the timeliness of the EEOC charge dated April 30, 2012**;** the court FINDS that the charge was timely filed and WILL AMEND its ruling in the prior Memorandum Opinion (doc. 95) to so reflect. However, that finding does not change the outcome, as the court made an *alternative* ruling on

---

[1] The court notes that the result is the same whether this ruling falls under Rule 60(b)(1)'s provision calling for relief from an Order based on a mistake, or under Rule 59(e) requesting the alteration of an Order because of evidence newly presented to the court that would cause manifest injustice if not considered.  No manifest injustice exists here because the outcome remains the same.

the Title VII claim, finding that it is due to be dismissed because Dr. Pouyeh did not meet his *prima facie* case.  That ruling stands.

In addition to the Charge Detail Inquiry, Dr. Pouyeh attached to his motion for reconsideration two additional exhibits: Exhibit 2 - Names of approved medical schools by liaison of AMA and CMA; and Exhibit 3 - website printout of ECFMG (Educational Commission for Foreign Medical Graduates).  These exhibits do not relate to the administrative exhaustion issue, are matters outside the pleadings, and are inappropriate for the court to consider on a motion to dismiss.  Accordingly, the court WILL EXCLUDE those documents by striking them.  *See* Fed. R. Civ. P. 12(d).

### *Clearly Erroneous/Manifest Injustice*

Having granted the motion for reconsideration, the court considers the other issues raised in Dr. Pouyeh's motion.  Dr. Pouyeh argues that the court's prior decision was clearly erroneous and would result in manifest injustice and proffers the following reasons.

*Plaintiff's Qualifications for Ophthalmology Residency*

Dr. Pouyeh argues that "the Court truly did a manifest error to ignore," in the Memorandum Opinion's statement of facts, his "qualifications specifically related to ophthalmology, including publications in ophthalmology journals, letters of recommendations from ophthalmologists of a well-known ophthalmology hospital in the USA, and being a reviewer of a well-known ophthalmology journal."  (Motion for Recons. Doc. 97, at 15).  The Memorandum Opinion did not list these particular facts; it stated "Dr. Pouyeh asserts that he was qualified for the positions because, among other facts, he graduated from Tehran University of Medical Sciences, 'ranked #1 for the past decade by the Ministry of Health in Iran,' where he

6

was a 'top student.'" (Doc. 95, at 2-3).  The court notes that the instant case is not one in which a

plaintiff identified a comparator who received the desired position, and invited the court to

compare the candidates' qualifications[2].  The court further notes that the correct role of the court

is not to determine whether Dr. Pouyeh is most qualified for the position and its role is not to

determine whether UAB's decision not to grant him an interview was unwise based on those

qualifications; the only role of the court is to determine whether that decision violated Titles VI

or VII, § 1981, or federal Constitutional law.  Rather, Dr. Pouyeh is challenging the UAB policy

requiring candidates to be graduates of class "A" medical schools approved by the AMA or

CMA, a requirement that he did not meet because of the medical school he attended, regardless

of his other qualifications.  Accordingly, the court FINDS no clear error or manifest injustice in

focusing on the fact relevant to the challenged requirement in UAB's policy: the medical school

from which Dr. Pouyeh graduated was not approved by the AMA or CMA.

Dr. Pouyeh also discusses the class "A"[3] requirement.  Given that Dr. Pouyeh

acknowledged that he did not attend a medical school approved by the AMA or CMA, and thus,

did not meet that eligibility requirement set out in UAB's policy, the court does not and need not

address this additional class "A" requirement.  The relevant remaining issues focus on whether

---

[2] While the focus of Dr. Pouyeh's pleading is on UAB's policy, his Fourth Amended Complaint includes the following statement: "Upon information and belief, the employer has hired applicants out of Plaintiff's protected group, who were less qualified than Plaintiff."  (4th Amend. Compl. Doc. 67, at 8, ¶ 30).  However, this statement is a conclusory one with no *facts* alleged to support it.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] Dr. Pouyeh discusses the class "A" requirement as if it were a requirement that applicants received "A" grades from medical school classes and objects to the requirement because his school gave number instead of letter grades.  The court reads the requirement as probably referring to a class of medical *schools*, not medical school *grades*, but the information of record does not otherwise address this issue.

the requirement of graduation from a medical school approved by the AMA or CMA was discrimination prohibited by American statutory or Constitutional law.

*§ 1981 Claim based on Alienage*[4]

Dr. Pouyeh argues that UAB's policy requiring graduation from an AMA- or CMA-approved medical school also violates § 1981.  In so arguing, he first characterizes as clearly erroneous the court's decision to dismiss the § 1981 claim because the court addressed the claim as one for discrimination based on *national origin* whereas Dr. Pouyeh also intended to assert a claim for discrimination based on his *alienage* as an immigrant to the United States from Iran. The court acknowledges that it read the complaint as focusing on Dr. Pouyeh's Iranian nationality, and further acknowledges that Count II does refer to "alienage/National Origin" instead of National Origin alone.  Section 1981 prohibits discrimination based on alienage.  *See Ramirez v. Sloss,* 615 F.2d 163, 167-68 & n. 5 (11th Cir. 1980) (citing *Sugarman v. Dougall,* 413 U.S. 634 (1973)); *see also Wright v. Southland Corp.,* 187 F.3d 1287, 1298 n. 12 (11th Cir. 1999) (a case addressing age discrimination and retaliation but discussing *Ramirez* and stating in a footnote that "[r]efusing to hire an individual on the basis of alienage is illegal under 42 U.S.C. § 1981"); *Anderson v. Conboy,* 156 F.3d 167, 171-72  (2d Cir. 1998) (holding that § 1981 prohibits discrimination based on alienage).

On reconsideration, the court acknowledges that Dr. Pouyeh asserted a § 1981 claim based on alienage, and that § 1981 does indeed prohibit discrimination based on alienage; it will

---

[4] The court notes that although the Defendant Board asserted defenses of Eleventh Amendment and sovereign immunity in its original Answer (doc. 49, at 10), it did not raise that issue in its motion to dismiss (doc. 73); thus, the court did not address it in its previous Memorandum Opinion and does not address it in this opinion on the motion for reconsideration.

AMEND its prior Memorandum Opinion to so reflect.   However, acknowledging that § 1981 prohibits discrimination based on alienage does *not* mean that Dr. Pouyeh has stated a plausible § 1981 claim in the instant case and that the dismissal of that claim is due to be vacated.  The § 1981 claim is nevertheless  due to be dismissed for the reasons discussed below, and thus, no manifest injustice has occurred from the dismissal.

*Policy: Facially Neutral or Facially Discriminatory*

Dr. Pouyeh challenges as erroneous the court's finding that UAB's policy, which requires that "[c]andidates must be graduates of  class 'A' medical schools approved by either the [AMA] or [CMA]," is facially neutral and does not discriminate against any classes protected by § 1981 or Title VII.  The court had previously found that "[n]either Title VII nor § 1981 prohibits discrimination based on the medical school from which one graduated."  (Memo Op. Doc. 95, at 8).  Dr. Pouyeh counters: "The Court did not address, however, if Title VII, Title VI, or § 1981 prohibits exclusion and discrimination of an applicant based on the country a person received such medical education and then immigrated to the USA."  (Motion for Recons. Doc. 97, at 10).

In the instant case, the court addresses the *policy* presented to this court.  The policy does not facially discriminate against a candidate based on his nationality or immigration status because a person from any nation or alienage who graduates from a class "A" medical school approved by either the AMA or CMA is eligible, although every candidate who meets the eligibility requirements will not necessarily receive a position.  Conversely, a person from America or Canada who does not graduate from a class "A" medical school approved by either the AMA or CMA is ineligible.  The policy not only excludes candidates, from whatever nationality and immigration status, who attended medical schools *outside* the United States and

9

Canada but also excludes candidates, from whatever nationality and immigration status, who attended medical schools *inside* the United States and Canada that are not class "A" and AMA- and CMA-approved.

The court understands that Dr. Pouyeh feels that he has been the subject of discrimination because he is the graduate of a medical school that was not AMA- or CMA- approved, and, thus, did not meet the eligibility requirements for a residency at UAB. However, Title VII and § 1981 do not protect against *all* perceived unfairness and discrimination; they only bar discrimination against the class specified and protected in each statute. Title VII does protect against employment discrimination based on national origin, but UAB's policy does not discriminate on its face based on national origin.[5] Section 1981 does protect against discrimination based on race and alienage, but UAB's policy does not discriminate on its face based on those protected factors. The court will discuss discrimination based on "pattern and practice" and "adverse impact" subsequently in this opinion.

> *Pattern and Practice under § 1981 and Title VII*

The court did not specifically discuss Dr. Pouyeh's "pattern and practice" argument in its

---

[5] Title VII does *not* guard against discrimination based on alienage. The Supreme Court of the United States had concluded that the term "national origin" is limited to "the country from which you or your forebears came," and thus, national origin discrimination as defined in Title VII case law encompasses discrimination based on one's ancestry but does not include discrimination based on one's immigration status. *See Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 95 (1973) (holding that "nothing" in Title VII "makes it illegal to discriminate on the basis of citizenship or alienage"). That conclusion does not mean that Title VII fails to protect aliens from discrimination; it protects "all individuals, both citizens and noncitizens, domiciled or residing in the United States, against discrimination *on the basis of race, color, religion, sex, or national origin.*" 29 C.F.R. § 1606.1(c) (1972) (emphasis added). It does not, however, protect aliens against employment discrimination *on the basis of alienage. Espinoza,* 414 U.S. at 95.

previous Memorandum Opinion, and thus, it WILL AMEND its Memorandum Opinion to include this discussion.  Where the face of a challenged policy itself does not discriminate based on a protected class, a plaintiff can use a "pattern and practice" argument to show that a defendant has a pattern or practice of applying a facially neutral policy in a way that discriminates against a particular protected class. *See, e.g., Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 304-06 (1977).  Dr. Pouyeh argues in his Motion for Reconsideration that UAB's policy requiring candidates for the opthalmology residency to have graduated from medical schools approved by the AMA or CMA is "a pattern and practice of discrimination ... against foreign nationals ... and immigrant doctors."  (Doc. 97, at 7-8).

The court acknowledges Dr. Pouyeh's rather condescending instruction to the court to "read this section slowly.  This is a multi-step logical reasoning and requires careful analysis." (Doc. 97, at 7-8).  The court assures Dr. Pouyeh that it has read this section slowly and carefully, and indeed, always endeavors to do so with every filing. It also acknowledges that filings by *pro se* litigants pose a particular challenge because the *pro se* litigant, however highly educated, does not always frame issues and facts and arguments in the way that lawyers are trained to do.  The court tried its best to comprehend Dr. Pouyeh's legal theories and the facts actually legally relevant to those theories.  As is the case of many *pro se* submissions, Dr. Pouyeh threw into his submissions many facts that are not legally relevant or material to the numerous legal theories he asserted, but none of those legal theories meets the requirements of the law.

In his motion for reconsideration, Dr. Pouyeh makes a "pattern and practice" argument of discrimination against immigrant Iranian doctors, or indeed, against all foreign nationals who did not graduate from a class "A" AMA- or CMA- approved medical school and who applied for the

11

UAB ophthalmology residency.  The only facts that Dr. Pouyeh proffers in the Fourth Amended
Complaint in support of any "pattern and practice" argument, other than his own qualifications
and rejection, are: (1) the fact that he knows of one Iranian doctor who was a graduate of an
Iranian Medical School and who told Dr. Pouyeh that he was not invited for an interview for the
UAB ophthalmology residency; (2) the fact that no Iranian doctor was selected for the UAB
ophthalmology residency for 2010, 2011; (3) a list of alumni of  UAB's Department of
Ophthalmology by name only with no other accompanying information about them; and (4) a
statement that "no immigrant Iranian doctor was selected among 132 residents for three years" in
UAB's Department of Internal Medicine.

 The Fourth Amended Complaint states conclusorily that "[f]or many years, 'almost all'
hired doctors for Ophthalmology Residency have been Americandoctors [sic] who were a
graduate of a medical school in the United States. (Exhibit C)." (Doc. 67, at 7, ¶ 20 - Exhibit C
being the list of alumni of UAB's Department of Ophthalmology).  However, the Complaint
contains no accompanying factual allegations about whether any Iranian doctor or immigrant
doctor except Dr. Pouyeh actually applied for the residency positions and no factual allegations
about any Iranian applicants' or immigrant applicants' qualifications relative to the selected
residents.  Further, the court notes that the few facts that Dr. Pouyeh proffers fail to include
important information, such as whether the other Iranian doctor referenced above actually
*applied* for the UAB ophthalmology residency; the number of Iranian doctors and other
immigrant doctors who applied for the UAB ophthalmology residency for 2010, 2011, and 2012;
the number of Iranian doctors and other immigrant doctors who applied for UAB's internal
medicine residency/internship;  the background and qualifications of the Iranian doctors who

applied for that residency in those years; and information about the alumni of UAB's Department of Ophthalmology in addition to their names, such as each person's national origin, immigration status, qualifications, and medical school attended prior to residency.

To the extent that Dr. Pouyeh argues that these facts state a plausible claim that UAB has engaged in a "pattern and practice" of intentional discrimination against Iranian doctors or Iranian immigrant doctors or immigrant doctors who have applied for the Ophthalmology Residency, the court rejects that argument.   As discussed above, the policy itself does not facially discriminate against Iranian doctors based on their national origin or against Iranian immigrants or other immigrants based on their alienage, and Dr. Pouyeh has not presented plausible allegations of *fact* that UAB had a pattern and practice of applying the policy in a discriminatory manner.  While Dr. Pouyeh alleges conclusorily that "almost all" the doctors UAB hired for Ophthalmology Residency and internal medicine residency have been American doctors, he provides no factual allegations that more than two immigrant doctors (himself and possibly one other Iranian doctor) were rejected for these residencies, and does not even specifically allege that the other immigrant doctor actually *applied* for the ophthalmology residency, although Dr. Pouyeh implies that his friend did.

And, contrary to Dr. Pouyeh's assertion that the bare list of Ophthalmology Department alumni names is "undisputable proof that for many years, foreign national were excluded in favor of Americans,"  that list, however Anglo-Saxon sounding those names may be, is not itself a *fact* supporting Dr. Pouyeh's claim of discrimination based on national origin or alienage.  As the court noted previously, the list contains no accompanying facts about the ethnicity, national origin, immigration status, or educational background of the alumni.  Mere conclusory language

13

unsupported by allegations of *fact* does *not* allow the court to draw a reasonable inference that UAB is liable for intentional discrimination based on national origin or alienage.  *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

The court FINDS that Dr. Pouyeh has not stated a plausible claim that UAB has a pattern and practice of applying its admissions policy to discriminate against Iranian immigrant doctors or immigrant doctors generally based on the alleged facts set out in the Fourth Amended Complaint.

The court notes that the Equal Protection Clause, § 1981, and Title VI protect only against *purposeful* discrimination, and courts have rejected the adverse impact theory in claims brought under § 1981 and § 1983 and Title VI.  *See, e.g., Alexander v. Sandoval,* 532 U.S. 275, 281 (2001) (stating that "Title VI itself directly reach[es] only instances of intentional discrimination")*; Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982) (§ 1981); *Freeman v. Motor Convoy, Inc.,* 700 F.2d 1339, 1350 (11th Cir. 1983) (§ 1981); *Washington v. Davis,* 426 U.S. 229, 239 (1976) (stating that "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is *unconstitutional* solely because it has a racially disproportionate impact . . . .'A purpose to discriminate must be present.'") (emphasis supplied).   Having addressed Dr. Pouyeh's arguments as to the § 1981 claim, except any based on an adverse impact theory, the court CONFIRMS its Order dismissing Dr. Pouyeh's § 1981 claim.   The court will proceed to address the adverse impact theory as to Title VII only, and will discuss Title VI separately.

14

*Adverse Impact*

Although Dr. Pouyeh frames his argument as one of "pattern and practice," what he *may* be attempting to argue instead is that, despite the fact that the face of the policy does not discriminate against residency candidates who are not American or Canadian, the policy has an *adverse impact* on residency candidates who are not American or Canadian and/or who have immigrated to the USA[6].  Because the court did not discuss this potential claim in its previous Memorandum Opinion, it WILL AMEND that opinion to include this discussion.

A claim based on a adverse impact theory focuses on discriminatory *results* whereas a claim based on disparate treatment focuses on discriminatory *intent*.  The theory holds that an employer's facially neutral policy or practice may be unlawful even absent an intent to discriminate when it has a significant adverse impact upon a protected category of people.  *See Griggs v. Duke Power Co.,* 401 U.S. 424, 430-32 (1971).

The court recognizes that the instant motion focuses on the sufficiency of the pleadings themselves, not the sufficiency of proof.  Because of the nature of an adverse impact claim, however, the court notes the framework required to establish an adverse impact case.  To establish a *prima facie* case under a theory of adverse impact, a plaintiff must show that the challenged policy or practice operates to exclude members of a protected group by selecting applicants for hire in a pattern significantly different *from that of the pool of applicants*.  If the plaintiff makes that showing of impact, then the defendant has the burden of production and persuasion to show that the policy or practice is "job-related for the position in question and

---

[6] As with all pleadings by a *pro se* litigant, in both the original Memorandum Opinion and this one, the court has attempted to decipher any claim the Plaintiff may potentially be asserting.

consistent with business necessity."  42 U.S.C. § 2000e -2(k)(1)(A) (I); *see Griggs,* 401 U.S. at

431; *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 (1975).  Only if the defendant meets the

burden, a plaintiff may rebut defendant's evidence by demonstrating that the employer failed to

implement an effective alternative practice that would have a lesser adverse impact.  42 U.S.C.

§§ 2000e-2(k)(1)(A)(ii, 2(k)(1)(c).

 Dr. Pouyeh did not use the term "adverse impact" or "discriminatory impact" in the

Fourth Amended Complaint, and the court could not divine such a legal theory from it.

However, having read Dr. Pouyeh's motion for reconsideration *slowly* and desiring to understand

his *pro se* arguments and construe them leniently under the circumstances as possibly advancing

an adverse impact claim, the court will address that possible claim brought pursuant to Title VII.

Dr. Pouyeh argues that because AMA-approved medical schools are located in the USA and

Puerto Rico and because CMA-approved medical schools are located in Canada, UAB's

requirement that residency candidates be graduates of CMA- or AMA-approved medical schools

has an adverse impact on immigrant doctors, and Iranian doctors such as Dr. Pouyeh, who

received medical education outside of the USA and Canada and then immigrated to the USA.

Dr. Pouyeh states: "[t]he Court did not address, however, if Title VII, Title VI, or § 1981

prohibits exclusion and discrimination of an applicant based on the country a person received

such medical education and then immigrated to the USA. . . . [T]he requirement of being a

medical doctor approved by AMA or CMA is discrimination against foreign nationals because it

excludes medical graduates of international medical schools. . . ."  (Doc. 97, at 10 & 11-12).  Dr.

Pouyeh insists that UAB's policy should have required that candidates be a graduate of a medical

school approved by the AMA or CMA *or ECFMG*, the ECFMG being an entity that evaluates

the qualifications of International Medical Graduates and international medical schools.

Dr. Pouyeh has identified the practice he claims is discriminatory, and he need not *prove* a *prima facie* case at this juncture.  However, to assert an adverse impact claim he nevertheless must plead *facts* that would support a plausible claim.  His Fourth Amended Complaint does not do so.  Dr. Pouyeh has failed to plead facts, that, if true, would show UAB's policy or practice operates to exclude members *of a protected group* by selecting applicants for hire in a pattern significantly different from that of *the pool of applicants*; he has pled no facts regarding the pool of applicants or pool of persons who considered applying but were barred from eligibility.  For all the court knows based on the allegations of the Fourth Amended Complaint, he and his Iranian friend, if his friend indeed applied, were the only applicants for the residency who were not American or Canadian.  Further, he does not plead facts about those who considered applying for the position but did not do so because of the eligibility requirements.

The facts pled do not state a plausible claim under an adverse impact theory; therefore, to the extent, if any, that Dr. Pouyeh has attempted to state a claim under that theory, the court FINDS that he has failed to do so.  The court's decision to dismiss the Title VII claim is not clearly erroneous based on any adverse impact theory.

For all of these reasons, the court FINDS that its decision to dismiss the Title VII claim in Count I was not clearly erroneous.  Having determined that the Title VII and § 1981 claims were properly dismissed, the court will address the claims brought under Title VI and the federal Constitution.

*Title VI*

Dr. Pouyeh also argues that the court should reconsider its decision to dismiss the Title

17

VI claim; he characterizes the ruling as clearly erroneous and resulting in manifest injustice.  He argues that the court incorrectly addressed his claim as one for *employment* discrimination when he couched his Title VI claim as one for *educational* discrimination. He takes the same hiring decision and calls it "educational discrimination" in Count III (Title VI) and  "employment discrimination" in Count I (Title VII).

Dr. Pouyeh brings numerous claims enmeshed in lengthy facts, each of which the court has tried to address, pairing the relevant facts with the most appropriate law.  Title VII only applies to employers and employment discrimination, and Title VI applies to "discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d (1964). The court acknowledges Dr. Pouyeh's assertion that, in addition to the employment component, the UAB residency position has an educational component, and that UAB is also an educational institution receiving Federal financial assistance. However, the residency position's combination of employment and educational components does not change the fact that, *for Title VII purposes*, a university or other entity engaging in the process of hiring medical residents or administering or participating in the residency program with control over access to the residency position is considered an employer, or stands in the place of an employer, and is liable under Title VII for employment discrimination the statute prohibits.  *See Zaklama v. Mt. Sinai Med. Ctr.,* 842 F.2d 291, 294 (11th Cir. 1988) (holding that a hospital participating in a medical residency program can be held liable in a suit brought pursuant to Title VII and § 1981 for the discriminatory discharge of plaintiff anesthesiology resident when it "control(led) the plaintiff's access to employment and den[ied] that access based on unlawful criteria."); *Takele v. Mayo Clinic,* 576 F.3d 834, 838 (8th Cir. 2009) (treating an applicant for admission to the Medical Physics

Residency Program at Mayo as an applicant for employment for the purposes of Title VII); *Shah v. Oklahoma, ex. Rel. Oklahoma Dept. Of Mental Health & Substance Abuse,* 485 F. App'x 971 (10th Cir. 2012) (treating defendant state hospital as a medical resident's employer for the purposes of Title VII); *Peck v. Montefiore Med. Ctr.,* 987 F. Supp. 2d 405 (S.D.N.Y. 2013) (on petition for preliminary injunction, addressing the failure to renew medical resident's contract as an employment decision within the purview of Title VII).

Indeed, Dr. Pouyeh agrees that a residency position has an employment component and acknowledges that the position is a paid one.  He simply asserts that the employment component and the educational component are not mutually exclusive and that the employment aspect does not bar a suit focused on the educational aspect.  However, as the court stated in the original Memorandum Opinion on the motion to dismiss, Title VI severely limits the circumstances under which a plaintiff may bring a private action to challenge an employment practice; Title VI *only* applies to "any employment practice of any employer ... *where a primary objective of the Federal financial assistance is to provide employment*."  42 U.S. C. § 2000d (emphasis added).

Thus, Congress specifically enunciated an exception to Title VI's employment limitation, and the exception does *not* include the instant situation, i.e., where the employment also contains an educational component.  The court will not imply an exception under such circumstances. Given that the decision whether to hire a medical resident has an employment component and falls under the purview of Title VII, and given that Congress has severely limited that application of Title VI to ensure that it could not be used as an end-run around Title VII's framework with administrative prerequisites for employment discrimination, logic suggests that a plaintiff may not avoid that framework here simply by re-characterizing a hiring decision as one of

19

"educational discrimination."  Dr. Pouyeh provides no case law or statutory support for his assertion that the court may ignore the employment component of the residency position in his Title VI claim, upon which he relies in his Title VII claim, just because the position also includes an educational component.

Dr. Pouyeh also points out that he carefully avoided using the term "employment" in his allegations of Count III.  Pleading is not a matter of using or avoiding magic words, and the court looks to the *facts* pled to determine the true nature of the claim, which is one for discrimination in hiring for a residency position.  That claim falls within the purview of Title VII as a claim for discrimination in the selection process for a paid position, and the court's ruling that Count I fails to state a claim under Title VII does not give Dr. Pouyeh an opportunity to focus solely on the educational component of the job, re-characterize it as "educational discrimination," and proceed under Title VI when the residency position he was denied is the same position in both claims. Dr. Pouyeh provides no support for that position, and the court is aware of none.

The court acknowledges Dr. Pouyeh's argument that Defendants' motions did not specifically address, discuss, or analyze Title VI at all.  The Defendants' motions requested the court to dismiss *all* claims against them for failure to state a claim, and that request encompassed the Title VI claims.  While the court agrees that the Defendants failed to provide specific discussion and case law directed at Count III, they failed to provide much specific discussion and case law directed at many of the claims.  The court does not encourage such a blithe approach to advocacy, but Defendants' failures do not change the fact that Dr. Pouyeh's Count III does not state a plausible claim under Title VI.

For all of these reasons, the court finds no clear error in the dismissal of the Title VI

claim in Count III.

*§ 1983 Claims*

Section 1983 provides a vehicle to hold a defendant liable for acts performed under color of state law that violate federal statutory or Constitutional law. *See Griffin v. City of Opa-Locka,* 261 F.3d 1295, 1303 (11th Cir. 2001). The court has already confirmed its decisions finding that the claims brought pursuant to Titles VI and VII and § 1981 fail to state a plausible claim. *See Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008) (stating that the analysis "under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same"). However, Dr. Pouyeh also asserts violations of federal Constitutional law. He asserts in his Fourth Amended Complaint and reiterates in his Motion for Reconsideration that the defendants have violated his right for "equal opportunity to gain a better socioeconomic status to be able to marry and support a family." (Motion for Recons. Doc. 97, at 16; *see* 4th Amend. Compl. ¶ 64).

The court reiterates what it stated in its Memorandum Opinion: "appropriate social and economic status" is not a Constitutional right and neither is the right to obtain a better socioeconomic status. (Doc. 95, at 13). As to the right to marry, the court reiterates that "Dr. Pouyeh provides no explanation of how the UAB policy, followed by the individual Defendants, affects his right to marry." *Id.* His motion refers to the policy's violation of a right to support a family, but Dr. Pouyeh referred to no such right in his Fourth Amendment Complaint nor does he identify in his motion which Constitutional provision confers such a right or explain how the policy violates that right.

In his motion, Dr. Pouyeh also refers to his liberty right under substantive Due Process of

21

law "to continue his profession in the USA and Alabama" and "to choose to be an

ophthalmologist." (Motion for Recons. Doc. 97, at 16).   Under the Fourteenth Amendment's

Due Process Clause, substantive due process "protects those rights that are 'fundamental,' that is,

rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate,* 20 F.3d 1550, 1556

(11th Cir. 1994).

Many professionals in the United States would be surprised and thrilled if they indeed

had a fundamental liberty right under the Constitution to practice their chosen profession.   Alas

for the doctors applying for various residencies and internships all over the country, the Supreme

Court of the United States has determined that no such fundamental Constitutional right exists.

*See Williamson v. Lee Optical of Okla.,* 348 U.S. 483, 488 (1955) (finding that challenged

portions of a statute regulating visual care, forbidding opticians from fitting or duplicating lense

without a prescription from an ophthalmologist or optometrist, were not unconstitutional because

a rational basis existed); *Locke v. Shore,* 634 F.3d 1185, 1195-96 (11th Cir. 2011)[7] (stating that

the "right to practice a particular profession is not a fundamental one.").   The court reiterates its

finding that Dr. Pouyeh has failed to state a plausible claim that Defendants have violated a

fundamental Constitutional right forbidden either by the explicit provisions of the Constitution or

by judicial recognition as implied by those provisions.

Given that fundamental rights are not implicated, Dr. Pouyeh's legal task is a difficult

one.  When challenging executive action on the part of the state, "plaintiffs face a high bar when

attempting to establish a substantive due process violation."  *Maddox v. Stephens,* 727 F.3d 1109,

---

[7] The court cited this case for the right proposition but cited the page number incorrectly in its original Memorandum Opinion on the motion to dismiss.

1119 (11th Cir. 2013).  "[N]ot every wrong committed by a state actor rises to the level of a

'constitutional tort,' sufficient to trigger a substantive due process violation."  *Lee v. Hutson,* 810

F.2d 1030, 1032, (11th Cir. 1987).  Where no fundamental Constitutional right is implicated,

courts have recognized that "'conduct by a government actor will rise to the level of a substantive

due process violation only if the act can be characterized as arbitrary or conscience shocking in a

constitutional sense.'" *Maddox,* 727 F.3d at 1119. (quoting *Waddell v. Hendry Cnty. Sheriff's*

*Office,* 329 F.3d 1300, 1305 (11th Cir. 2003)); *see also Cnty. of Sacramento v. Lewis,* 523 U.S.

833, 834 (1998) *(*finding that state executive action violates substantive due process when it

"shocks the conscience").  "[O]nly the most egregious executive action can be said to be

'arbitrary' in the constitutional sense."  *Maddox,* 727 F.3d at 1119 (citing *Collins v. Harker*

*Heights,* 503 U.S. 115, 129 (1992)).

    The court notes that its prior Memorandum Opinion (doc. 95) addressing the motion to

dismiss analyzed this substantive due process challenge under the rational basis standard, which

is appropriate for substantive due process claims addressing legislative action affecting rights

that are not fundamental Constitutional rights.  However, because the challenged state action was

executive instead of legislative, the court WILL AMEND that opinion to include this analysis

using the correct standard.

    While "the measure of what is conscience-shocking is no calibrated yard stick," *Lewis,*

523 U.S. at 1716, courts have clarified that "'[m]ere negligence does not rise to the level of a

Fourteenth Amendment violation[.]'" *Maddox,* 727 F.2d at 1119 (citing *Bendiburg v. Dempsey,*

909 F.2d 463, 470 (11th Cir. 1990 and *Lewis,* 523 U.S. at 849).  "Even intentional wrongs

seldom violate the Due Process Clause."  *Maddox,* 727 F.2d at 1119.  "Determinations of what is

egregious conduct must not be made in the glow of hindsight; decisions made by a government actor *must be egregious—that is, shock the conscience—at the time the government actor made the decision." Waddell,* 329 F.3d at 1305 (emphasis in original).  "Conduct intended to injure in some way that is unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level . . . ." *Maddox,* 727 F.3d at 1119.

In the instant case, UAB's challenged policy setting eligibility requirements for ophthalmology residents represents one reasonable means of achieving an obvious government interest:  "[s]tates have a compelling interest in the practice of professions within their boundaries, and that as a part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975).

In his Motion for Reconsideration, Dr. Pouyeh acknowledged that the State of Alabama and Defendants acting on behalf of the state have a legitimate reason—"patients' safety and quality of care"—to require ophthalmology training before obtaining a license to practice that profession and to limit ophthalmology training to qualified applicants.  (Motion for Recons. Doc. 97, at 17).  He simply argued that requiring applicants to be graduates of a class "A" AMA- or CMA-approved medical schools is not "a reliable and standard way to evaluate an applicant's qualification...."  (Doc. 97, at 17).  Instead, he argues that the more reliable and standard way to ensure applicants' qualification would be to use the applicant's USMLE [United States Medical Licensing Examination] scores and to expand the medical school eligibility to ECFMG-approved schools in addition to AMA- and CMA-approved medical schools.

The court understands why Dr. Pouyeh would prefer his proposed standard over the

24

current UAB requirements, but his personal preferences do not govern Constitutional law; the Constitutional provisions and the case law interpreting them govern instead.  And, Dr. Pouyeh is wrong to assume that a state actor violates substantive due process when his means of reaching a state interest is not perhaps the *best* means; Dr. Pouyeh provides no case law stating that a policy is arbitrary and shocks the judicial conscience merely because it does not provide the *best* means of achieving a legitimate government interest.  The court is aware of no support for such an argument.[8]  Dr. Pouyeh has not stated a claim that the Defendants' action is unjustified by any government interest.  Rather, UAB's policy is a reasonable, reliable means of achieving its legitimate government interest of protecting the public health and safety and regulating the practice of the medical profession.

The court FINDS that Dr. Pouyeh states no plausible claim that the state action by the Defendants shocks the conscience, is arbitrary in the Constitutional sense, or violates substantive due process.  It WILL AMEND its Memorandum Opinion addressing the motion to dismiss the Fourth Amended Complaint to include that finding,  and WILL CONFIRM its decision that the substantive due process claim is due to be dismissed.

Further, the court notes that Dr. Pouyeh does not address the court's alternative finding that, to the extent any Constitutional right and violation of that right exist, qualified immunity

---

[8] Although the court does not address this substantive due process challenge of executive action under a rational basis standard, the court notes that the Supreme Court has found under that standard that "[t]he fact that other means are better suited to the achievement of governmental ends ... is of no moment under rational basis review."  *See Tuan Anh Nguyen v. I.N.S.,* 533 U.S. 53, 77 (2001) (stating quoted language); *Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 316 (1976) (per curiam) ("[T]he State perhaps has not chosen the best means to accomplish this purpose.  But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect.'" (quoting *Dandridge v. Williams,* 397 U.S. 471, 485 (1970)).

attaches to claims against the individual Defendants.

Having found that dismissal of all claims in this lawsuit was appropriate and that any errors made do not change the appropriateness of the dismissal, the court WILL CONFIRM its ORDER dismissing the claims.

Dated this 5th day of November, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE